ERIC A. GROVER (SBN 136080)
eric.grover@kellergrover.com
RACHAEL G. JUNG (SBN 239323)
rachael.jung@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, California 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

SCOT BERNSTEIN (SBN 94915)
swampadero@sbernsteinlaw.com
**LAW OFFICES OF SCOT D. BERNSTEIN,
A PROFESSIONAL CORPORATION**
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 447-0100
Facsimile: (916) 933-5533

*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

Timothy D. Cohelan, Esq. (SBN 60827)
tcohelan@cklaw.com
Isam C. Khoury, Esq. (SBN 58759)
ikhoury@cklaw.com
**COHELAN KHOURY & SINGER**
605 C Street, Suite 200
San Diego, California 92101
Telephone: (619) 595-3001
Facsimile: (619) 595-3000

Patrick N. Keegan, Esq. (SBN 167698)
pkeegan@keeganbaker.com
**KEEGAN & BAKER, LLP**
2292 Faraday Avenue, Suite 100
Carlsbad, California 92008
Telephone: (760) 929-9303
Facsimile: (760) 929-9260

*Attorneys for Plaintiff*
John Deddeh

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CAROLUS, SABER KHAMOOSHI, RYAN WU, and JOHN DEDDEH, individually and on behalf of a class of similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> NEXSTAR MEDIA INC. <br><br> Defendant. | Case No: 3:24-cv-07790-VC <br><br> CLASS ACTION <br><br> **FIRST CONSOLIDATED COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Action Filed:  October 8, 2024 <br> Removed: :   November 7, 2024 <br> Consolidated: January 23, 2025 |

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## CLASS ACTION COMPLAINT

Plaintiffs Brian Carolus, Saber Khamooshi, Ryan Wu, and John Deddeh, on behalf of themselves and a class of similarly situated individuals as defined below, and based on personal knowledge where applicable, information and belief, and investigation by counsel, allege the following against Defendant Nexstar Media Inc. ("Defendant" or "Nexstar").

## INTRODUCTION

1.      This class action lawsuit arises out of Defendant's policy and practice during the proposed class period (i.e., the applicable limitations period preceding the filing of the Complaint in this matter and through and including June 26, 2024) of embedding and using various trackers on Defendant's website, www.thehill.com, to (1) install and store third-party tracker cookies on website users' browsers and (2) surreptitiously share and allow those third-party trackers to collect website users' browser and device data as well as their personally identifying and addressing information, such as IP addresses[1].  Defendant did all of that without users' knowledge, authorization, or consent.

2.      Defendant Nexstar Media Inc. is a wholly-owned subsidiary of Nexstar Media Group, Inc., one of the largest broadcast television groups in the United States, comprising top network affiliates with 200 owned or partner stations in 116 U.S. markets reaching 220 million people.  Nexstar's portfolio includes seven local California television stations covering the San Francisco Bay Area, Los Angeles, San Diego, Sacramento, Fresno, and Bakersfield markets.

3.      Defendant provides news, sports and entertainment programming and management, sales and other services to television stations.  In August 2021, Defendant acquired The Hill, one of the nation's leading independent political digital media platforms.  The Hill and Nexstar are used by a third of all digital media viewers in the United States.

---

[1]  IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information.  *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

4. Defendant owns and operates the www.thehill.com website (the "The Hill website"), which provides access to news, political opinions and a broad variety of content. With more than 100 journalists who cover political news and events, The Hill is a premier source for political and policy news coverage in the United States. The Hill touts itself as the largest independent political website in the country. According to a Nexstar press release, The Hill's business model is primarily advertising supported by direct, programmatic and licensing revenue.

5. Plaintiffs and Class members who visited Defendant's The Hill website during the proposed class period expected that their personally identifying information, including their IP addresses, would remain private and confined to their use own of the website. Plaintiffs and Class members had and were entitled to have a reasonable expectation that their accessing of and interactions with Defendant's The Hill website during the proposed class period would not be sold for advertising purposes or shared with any third parties, let alone to *undisclosed* third-party trackers.

6. Unbeknownst to individuals entering and viewing Defendant's The Hill website during the proposed class period, third-party trackers were embedded into Defendant's website. Through that embedded tracking technology, while Plaintiffs and Class members were accessing and interacting with Defendant's The Hill website, Defendant was (1) installing and storing third-party tracker cookies on users' browsers and (2) disclosing and sharing The Hill website users' browser and device data, IP addresses and other identifying information with those third-party trackers. All of this happened the moment users entered Defendant's The Hill website and without any further action required by or requested of the users. And it happened without any meaningful notice.

7. Plaintiffs are informed and believe and on that ground allege that Defendant surreptitiously shared identifying data, including addressing information such as IP addresses, with the third-party trackers for advertising and analytics-related purposes. Defendant did so without obtaining The Hill website's users' authorization or consent and without a court order.

8. Defendant's unauthorized (1) installation of third-party tracker cookies on users' web browsers and (2) disclosure to and collection by third parties of Plaintiffs' and Class members'

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   personally identifying and addressing information, all without consent or adequate notification to

2   Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy.

3   Defendant's actions also violated multiple laws, including the California Computer Data Access

4   and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal.

5   Penal Code §§ 630, *et seq.* ("CIPA"); the right to privacy under Article 1, § 1, of the California

6   Constitution, which includes privacy as one of six fundamental rights of all Californians; and

7   California Business & Professions Code §§ 17200, *et seq.* (The Unfair Competition Law or

8   "UCL").

### PARTIES

#### A.    Plaintiff Brian Carolus

9.    Plaintiff Brian Carolus is a natural person and a resident of California.

10.    Plaintiff Carolus regularly visited Defendant's The Hill website to browse political news headlines and to read articles.  He visited Defendant's The Hill website on several occasions during the proposed class period.  Plaintiff Carolus used an internet browser on his various computers to access Defendant's website.

11.    At no time when Plaintiff Carolus entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

12.    Plaintiff Carolus also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers.  Further, because Defendant did not provide notice or request permission, Plaintiff Carolus was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

#### B.    Plaintiff Saber Khamooshi

13.    Plaintiff Saber Khamooshi is a natural person and a resident of California.

14.    Plaintiff Khamooshi regularly visited Defendant's The Hill website to browse political news headlines and to read articles.  He visited Defendant's website on several occasions during the proposed class period.  Plaintiff Khamooshi used an internet browser on his multiple

1   computers to access Defendant's website.

2       15.   At no time when Plaintiff Khamooshi entered Defendant's The Hill website and

3   viewed its contents during the proposed class period did he authorize or consent to Defendant

4   installing third-party tracker cookies on his internet browser or computer.

5       16.   Plaintiff Khamooshi also did not consent to Defendant sharing or selling his

6   browser and device data, IP addresses and other personally identifying information with or to third-

7   party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff

8   Khamooshi was unaware of and had no meaningful opportunity to opt out of or object to that

9   unauthorized disclosure of his data.

10      **C.    Plaintiff Ryan Wu**

11      17.   Plaintiff Ryan Wu is a natural person and a resident of California.

12      18.   Plaintiff Wu regularly visited Defendant's The Hill website to browse political

13   news headlines and to read articles. He visited Defendant's The Hill website on several occasions

14   during the proposed class period. Plaintiff Wu used an internet browser on his various computers

15   to access Defendant's website.

16      19.   At no time when Plaintiff Wu entered Defendant's The Hill website and viewed its

17   contents during the proposed class period did he authorize or consent to Defendant installing third-

18   party tracker cookies on his internet browser or computer.

19      20.   Plaintiff Wu also did not consent to Defendant sharing or selling his browser and

20   device data, IP addresses and other personally identifying information with or to third-party

21   trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Wu

22   was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized

23   disclosure of his data.

24      **D.    Plaintiff John Deddeh**

25      21.   Plaintiff John Deddeh is a natural person and a resident of California. While

26   physically present in California, Plaintiff Deddeh used an internet browser on his computer and on

27   his cellular phone to access Defendant's The Hill website on several occasions during the proposed

28   class period to browse news headlines and to read articles.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

22.     At no time when Plaintiff Deddeh entered Defendant's The Hill website and viewed its contents during the proposed Class Period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer. Plaintiff Deddeh also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Deddeh was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data

**E.      Defendant and its The Hill Website**

23.     Defendant Nexstar Media Inc. is a corporation organized under the laws of the State of Delaware.  Its headquarters are in Irving, Texas.  Defendant systematically and continuously does business in California and with California residents.

24.     As part of its broadcasting group, Nexstar owns and operates numerous local television stations and digital platforms in California serving various California markets.  Those stations and platforms include, but are not limited to, the following:

       a.   KRON-TV and KRON4.com in San Francisco, California;

       b.   KTLA-TV and KTLA.com in Los Angeles, California;

       c.   KSWB-TV and FOX5sandiego.com in San Diego, California;

       d.   KUSI-TV and KUSI.com in San Diego, California;

       e.   KTXL-TV and FOX40.com in Sacramento, California;

       f.   KSEE-TV and Yourcentralvalley.com in Fresno, California; and

       g.   KGET-TV and KGET.com in Bakersfield, California.

25.     These local California television stations and websites cover national headlines as well as pertinent local news stories, local sports, and local events.  They also show and display California-specific advertising, including for local California businesses.  Further, Nexstar's local station websites have a "Jobs" or "Marketplace" tab for website visitors to search for or post job openings available within that geographic area of California.

26.     In addition to other news and events, Nexstar's California television stations and websites provide in-depth coverage of California politics.  In 2020, for example, Nexstar created

a weekly broadcast show titled "Inside California Politics," which examines the political, economic, and social issues important to Californians across the state.  Later that same year, Nexstar expanded the show to be aired and available on all six of its California television stations and local websites.  According to a September 9, 2020 Nexstar press release, "Inside California Politics" "will now offer the unparalled opportunity to reach more than 22 million viewers across the state of California."

27.     More recently, in February 2024, Nexstar's California television stations hosted a multi-market exclusive live telecast of a debate among the top four candidates for the U.S. Senate from California.  The debate originated from the KRON-TV studios in San Francisco, and aired exclusively across Nexstar's television stations and digital platforms serving California.

28.     To carry out its numerous business activities inside California, Nexstar maintains offices and television stations throughout California and employs a number of individuals within and around the State.  At the end of January 2025, under the "Careers" tab on the Nexstar website, there were at least 56 job postings listed for California jobs to add to Nexstar's California workforce in seven different cities, including Fresno, San Francisco, Los Angeles Sacramento, San Diego, Bakersfield, and Burbank.[2]

29.     As part of its mass-media holdings, Defendant currently owns and operates its www.thehill.com website, which covers political news and events.  The Hill is a nationally recognized brand known for delivering balanced political reporting, authentic opinions and perspectives.

30.     During the proposed class period, Defendant's The Hill website failed to put visitors on notice of Defendant's use of website tracking technology, including its use of third-party trackers.  Upon information and belief, Plaintiffs allege that third-party trackers allow companies like and including Defendant to sell advertising space on their websites by using the tracking technology to receive, store and analyze information collected surreptitiously from

---

[2]  Search for Jobs, Nexstar, https://nexstar.wd5.myworkdayjobs.com/en-US/nexstar?locationRegionStateProvince=ec3d210e4240442e99a28fa70419aec5 (last visited January 28, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1    website visitors.

2        31.    During the proposed class period, Defendant's The Hill website also failed to

3    disclose the selling and sharing of browser and device data and personally identifying information,

4    including IP addresses and other addressing information, to and with unauthorized third party-

5    trackers for advertising and other purposes.

6                            **JURISDICTION AND VENUE**

7        32.    This Court has subject matter jurisdiction over this action under the Class Action

8    Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  Specifically, this action satisfies all requirements

9    for federal jurisdiction under CAFA in that the allegations in this Complaint identify a putative

10   class of more than 100 members, establish the minimum diversity of citizenship required under

11   CAFA, and place in controversy more than $5 million in the aggregate for the entire class,

12   exclusive of interest and costs. 28 U.S.C. § 1332(d) and (d)(5) and § 1453(b).

13       33.    This Court has personal jurisdiction over the parties because Defendant has

14   sufficient minimum contacts with this State in that it operates and markets its services throughout

15   the State, including directing targeted advertising to California residents.  As described in

16   Paragraphs 24 through 28, Defendant's activities in California are substantial, continuous and

17   systematic.  Defendant owns and operates seven California television stations and its local station

18   websites, each focusing on local news and content, promoting local California businesses, and

19   serving local regional advertisements.  Defendant also provides extensive in-depth coverage of

20   California politics, including specific programming that reaches more than 22 million Californians.

21       34.    To conduct its numerous business activities within California and support its local

22   TV stations and affiliates, Defendant employs California residents and maintains offices in

23   multiple cities throughout California.  As of the filing of this consolidated Complaint, Nexstar has

24   56 job openings and opportunities in California, located in Fresno, the San Francisco Bay Area,

25   Los Angeles, Sacramento, San Diego, Bakersfield, and Burbank.

26       35.    Further, a substantial part of the events and conduct giving rise to Plaintiffs' claims

27   occurred in the State of California.  Those events and that conduct included Plaintiffs' accessing

28   of and interacting with Defendant's The Hill website, Defendant's unauthorized installation of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

third-party tracker cookies on Plaintiffs' and California users' web browsers, and the disclosure and surreptitious sharing of browser and device data and personally identifying information with the third-party trackers, all without users' knowledge, authorization, or consent. Plaintiffs' rights were violated in the State of California; and those violations arose out of Plaintiffs' contact with Defendant from and within the State of California.

36.    Venue is proper in this Court because Defendant removed the action from San Francisco County Superior Court. Venue was proper in that Court under Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections, which provide that if a foreign business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, Defendant Nexstar Media Inc. is a foreign business entity and had failed to designate a principal place of business in California with the office of the Secretary of State as of the date on which the Complaint in this action originally was filed.

## STANDING

37.    Article III standing is met when a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 337, 338 (2016).

38.    Plaintiffs meet the "injury in fact" requirement because the invasion of their privacy is a "concrete and particularized" injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized.").

39.    Plaintiffs allege that they were personally injured when Defendant impermissibly obtained Plaintiffs' personal information. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g.*, *Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involved a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing.").

40.    Separate from an invasion-of-privacy harm, Plaintiffs also allege economic harm sufficient for Article III standing by alleging that user data carries financial value, citing a study that puts a quantifiable number on the value of that user data, and by alleging that Defendant profited from the misappropriated data.

41.    The Ninth Circuit has found such allegations to be sufficient to establish Article III standing under a theory of economic harm. *See Facebook Tracking*, 956 F.3d at 600. Further, "[u]nder California law, this stake in unjustly-earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Facebook Tracking*, 956 F.3d at 600.

42.    Plaintiffs' injuries are "fairly traceable" to Defendant's challenged conduct[3] because Defendant acquired Plaintiffs' private information through the use of third-party trackers that are embedded into Defendant's The Hill website.  Plaintiffs' injuries therefore occurred the moment their information was acquired improperly by Defendant.

43.    Plaintiffs also meet the redressability element because courts consistently have recognized that violations of privacy rights can be redressed by an award of damages or injunctive relief. *See Facebook Privacy*, 402 F.Supp.3d at 784, stating that "[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts." *See also Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar).  Additionally, the injunctive relief that Plaintiffs seek includes terminating all downstream distributions of that illegally collected personal data.  That is a remedy that would redress future harms suffered by Plaintiffs and the Class and would have the potential to prevent those future harms.

### FACTUAL ALLEGATIONS COMMON TO THE CLASS

#### A.    Website Tracking Technology

44.    Trackers collect information about internet users as those users are browsing the

---

[3]  *Spokeo*, 578 U.S. at 338.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

web.  Trackers use cookies, scripts or pixels inserted by publishers or advertisers.  Tracker profiling is the process of linking data from different websites to build user profiles based on browsing history, to place users in groups, and to sell that data to third parties so that they can use it for targeted advertising.

45.    A broad range of online technologies track and monitor internet-based interactions and communications.  Four identifier tools commonly used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

46.    A website cookie is a small text file that a website server creates and transmits to a web browser (*e.g.*, Chrome or Safari) which then installs and stores the file in a particular directory on an individual's computer, phone or other device.[4]  When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load.  While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

47.    Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., hulu.com or facebook.com).  Cookies also have information about the user's interaction with a website, such as how the website should be displayed; how many times a user has visited the website; how long a user spends on a webpage; information about what pages the user visited; and authentication information.  In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address and/or telephone number if that information was provided to a website.

48.    A first-party cookie is implemented by the website that the user accesses.  The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that

---

[4]  See Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?*, All About Cookies (Jul. 28, 2023), https://allaboutcookies.org/what-is-a-cookie.

belongs to a domain other than the one being displayed to the user in his or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first- and third-party cookies are who sets them (*i.e.*, a website display host or a third party), whether and how they can be blocked by a web browser, and the cookies' availability. A third-party advertising or tracker cookie is accessible on any website that loads the third-party server's code.

49.     A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon," is similar to a website cookie. It is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the kind of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[5]

50.     Digital fingerprinting refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content and operating appropriately. ***Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.***[6]

51.     A software development kit (SDK) is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions and tutorials.[7] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

---

[5] See Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Sept. 26, 2023), https://allaboutcookies.org/what-is-a-web-beacon.

[6] See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/.

[7] *What Is an SDK? Software Development Kits Explained*, Okta, Inc. (June 30, 2022), https://www.okta.com/identify-101/what-is-an-sdk.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

52.    All of the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

**B.    Internet Protocol Addresses ("IP Addresses")**

53.    One important piece of identifying information collected by third-party trackers is a website user's IP address.  An IP address is a unique identifier for a device, which is written as four sets of numbers separated by periods (*e.g.*, 123.145.167.189).  The first two sets of numbers reflect what network the device is on; the second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a computer's web browser communicating with a website server.

54.    An IP address is a unique numerical code associated with a specific internet-connected device on a computer network.  A unique IP address identifies each of the devices accessing a certain network at any given time.

55.    Significantly, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined.  Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[8]

56.    Knowing a website user's IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[9]  An IP address allows advertisers to target customers by countries, cities, neighborhoods and postal code.[10]  Even more specifically, it allows advertisers to target specific households, businesses and even individuals with ads that are relevant to their interests.[11]

---

[8]  *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[9]    *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited April 17, 2024).

[10]    *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited April 17, 2024).

[11]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

57.     Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because companies can use an IP address to identify individuals personally.[12]  By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision.[13]   Additionally, by analyzing data regarding which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[14]

58.     As alleged below, Defendant installed third-party tracker cookies on Defendant's The Hill website users' browsers.  Those trackers unlawfully have collected browser and device data as well as identifying and addressing information about Plaintiffs and Class members, including their IP addresses.  They have done so without a court order and without Plaintiffs' or Class members' consent.

### C.     Defendant's use of third-party trackers on its The Hill website

59.     Defendant has embedded and implemented several third-party trackers on its The Hill website, including but not limited to (i) Media.net Tracker, (ii) CasaleMedia Tracker and (iii) Adnx Tracker (referred to collectively as the "trackers").  By installing those trackers and their corresponding tracking cookies, Defendant can sell advertising space on its The Hill website. Doing that enables Defendant to monetize its website further and obtain additional revenue.

60.     Moreover, by collecting and disclosing its users' information, Defendant's The Hill can place advertisements on other companies' websites, thereby increasing public awareness of The Hill's brand, increasing its sales, and enabling Defendant to obtain and analyze users' data for its own profit.

61.     When a website user first accesses and enters Defendant's The Hill website, the

---

[12]  Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[13]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[14]  *Id.*

user's browser sends an HTTP request to Defendant's server. Defendant's The Hill website server then sends an HTTP response with directions to load the webpage content and to install the three trackers on the user's browser.

62.     Each tracker installs and stores its own website cookie on the user's browser and uses that third-party tracker cookie to collect and share that user's browser and device data and addressing information, including IP addresses, *every time the user visits and interacts with Defendant's The Hill website.*

63.     The process described above takes place behind the scenes and in less than a second. Thus, the three tracker cookies appear and are implemented the instant the user enters Defendant's The Hill website. No further actions, clicks or consent from the user are required.

64.     Further, each of the three trackers embedded on Defendant's website re-installs its tracker cookies every time a user visits Defendant's The Hill website. Thus, even if a user clears the cookies from the user's browser, it makes no difference: the next time that user visits Defendant's The Hill website, all three trackers re-install their tracker cookies, reset the tracking process, and resume transmission of the user's browser and device data, IP address and other identifying information to the undisclosed third parties.

65.     The Media.net Tracker is developed by Media.net, a global leader in contextual advertising. Media.net's advanced programmatic platform includes a next-generation, cross-format bidding technology and a proprietary contextual targeting engine, which supports its unique display-to-search ("D2S") ad format. That innovative format monetizes display placements by capturing user search intent and displaying relevant search keywords, which result in highly targeted ads.

66.     The company developed its Media.net Tracker to enhance the real-time bidding ("RTB") process within its platform. The tracker is designed to collect user data, including browser and device data and IP addresses, in order to fine tune ad targeting and increase the effectiveness of online advertising. The Media.net tracker utilizes both third-party and first-party data to ensure precise ad placements and to increase the relevancy of ads that are served.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

67. When a user visits Defendant's The Hill website, the Media.net Tracker installs and stores its website cookie on the user's browser. This third-party tracker cookie is used to collect and share that user's browser and device data, IP address, and other identifying information with third-party Media.net. That, in turn, enables Media.net to serve personalized, targeted advertisements and to optimize and maximize user engagement. Media.net receives a user's data and IP address each and every time the user interacts with Defendant's The Hill website. *See* Figure 1.

**Figure 1**:



68. The CasaleMedia Tracker is developed by Index Exchange, Inc. ("Index Exchange"), formerly known as Casale Media. By integrating third-party and first-party data, Index Exchange seeks to maximize ad relevancy and placement precision within its global advertising marketplace by leveraging the company's advertising technology experience for publishers, advertisers and consumers. The CasaleMedia Tracker collects user data, including browser and device data and IP addresses, to enable website owners to analyze user data

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

thoroughly, target specific user demographics, and optimize their marketing campaigns by increasing advertising effectiveness. By continuously updating its data sets to refine ad targeting, the CasaleMedia Tracker allows for the strategic collection of users' information for use by third-parties that purchase the information.

69. The Hill embeds Index Exchange's code on its website. That hidden code enables Index Exchange to install and store the CasaleMedia Tracker and its corresponding website cookie on users' browsers. Like the Media.net Tracker above, the CasaleMedia Tracker is installed the instant a user accesses Defendant's The Hill website. That happens without any notice to the user and without any request for permission from the user. By using HTTP requests and responses, cookies, IP addresses and other information shared by Defendant's The Hill website, third-party Index Exchange can track and deliver personalized ads based on users' browsing habits and preferences, geographic locations, and other data personal to the users.

70. During the HTTP communication process, the CasaleMedia tracker cookie stores identifiers linked to users' browsing behavior. That enables Index Exchange to recognize that user on the user's subsequent visits to The Hill or to other websites within Index Exchange's advertising network. That, in turn, facilitates a cycle of ad targeting and tracking.

71. Index Exchange also receives a user's browser and device data and IP address every time the user interacts with Defendant's The Hill website. Thus, even if the user clears the cookies from the user's browser, *the CasaleMedia Tracker is re-installed instantly* on the user's next visit to Defendant's The Hill website. That automatic process ensures that Index Exchange consistently receives the user's data and IP address with each and every website interaction. *See* Figure 2.

**Figure 2**:



72.      The third tracker embedded in Defendant's The Hill website is developed by software company Xandr, which Microsoft acquired in 2021.  Xandr operates as an advanced advertising company that claims to provide a comprehensive platform for buying and selling consumer-oriented digital advertising.  The platform, which includes programmatic advertising, data analytics and cross-screen media solutions, claims to improve the efficiency and effectiveness of advertising across various channels by leveraging data and technology.

73.      Like other third-party trackers, Xandr allows companies like Defendant to sell advertising space on their websites by using the Adnx Tracker to receive, store and analyze information collected from website visitors.  The Adnx Tracker is installed and stored on the user's browser the instant the user enters Defendant's The Hill website.  The third-party tracker cookie then sends the user's IP address to Xandr each and every time the user interacts with Defendant's The Hill website.  *See* Figure 3.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Figure 3**:



74.    During the proposed class period, each of the three trackers embedded on Defendant's The Hill website (1) installed a third-party tracker cookie on users' browsers and (2) captured, collected and shared with undisclosed third parties The Hill website users' personally identifying and addressing information, including the users' IP addresses, ***all without users' knowledge or consent***.

75.    Upon further information and belief, when a user entered Defendant's The Hill website, all three trackers were used for RTB, an advertising auction that took place almost instantly.  Defendant's website used the third-party trackers to "host" the bidding on Defendant's behalf.  The RTB system was designed to allow Defendant to sell targeted advertising and to maximize its revenue gained from selling ad space on Defendant's The Hill website.

76.    Further, each of the three trackers embedded on Defendant's website re-installed its tracker cookies automatically every time a user visited Defendant's The Hill website.  That happened even if the user previously had cleared the cookies from his or her web browser.  As a result, during the proposed class period, *Defendant's The Hill website users could not escape the unauthorized sharing of their personally identifying and addressing information with third-parties Media.net, Index Exchange, and Xandr.*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**D.    Plaintiffs and class members did not consent to Defendant's disclosure of their personally identifying and addressing information; they had and have a reasonable expectation of privacy in their user data.**

77.    During the proposed class period, Defendant did not ask its The Hill website visitors, including Plaintiffs, whether they consented to having their personally identifying and addressing information disclosed to and used by third parties like Media.net, Index Exchange, and Xandr.  When a website user accessed and entered Defendant's The Hill website during the proposed class period, there was no pop-up window or other notification to inform users that Defendant was using website tracking technology or installing third-party tracker cookies.

78.    Additionally, the third-party trackers were incorporated seamlessly – ***and, to users, invisibly*** – in the background on Defendant's The Hill website.  That seamless and invisible incorporation gave Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling the collection of their browser and device data and personally identifying and addressing information, including their IP addresses, for use by undisclosed third parties.

*79.*    Further, although Defendant's The Hill website does have a Privacy Policy containing some disclosures about how information is shared, ***that policy can be viewed only after scrolling all the way through the website content to the very bottom of the webpage.***  During the proposed class period, Defendant's policies and notices would be seen, if at all, only long after the third-party trackers and cookies had been installed on users' web browsers – ***in other words, only after it was too late.***

80.    In addition to its hard-to-see location, the hyperlink to access the Privacy Policy is written in small, inconspicuous font and is listed among a number of other links at the bottom of Defendant's The Hill webpage.  *See* Figure 4.

1

**Figure 4:**



81.     Unlike first-party cookies that might be technologically necessary to enable a computer user to view a webpage, ***third-party tracker cookies are not necessary***.  Moreover, they (1) simultaneously communicate information to an external server as a user navigates a website; (2) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user; (3) are not easily disabled by users; and/or (4) ***create a record of all of the information that users provide to and/or receive from the website***.  Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiffs and Class members could not and did not consent to the collection, storage and use of their personally identifying and addressing information by undisclosed third parties like Media.net, Index Exchange, and Xandr.

82.     During the proposed class period, Plaintiffs and Class members had a reasonable expectation of privacy in their interactions with Defendant's The Hill website and in their user data, especially their personally identifying information.  That is even truer of Plaintiffs' and Class members' IP addresses, which contain geolocation data that can be used to identify, track and target individuals in a very specific and precise way.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

83.     Privacy studies, such as those conducted by the *Pew Research Center*, show that most Americans are concerned about how data is collected about them.[15]  Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares data regarding a customer or other individual.

84.     Indeed, according to *Consumer Reports*, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy.  Further, nearly two thirds of Americans – **64%** – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to obtain a consumer's permission before sharing a consumer's information.  To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[16]

85.     Users act in a manner that is consistent with those preferences.  During a rollout of new iPhone operating software, for example, ***94% of U.S. users who were asked for clear, affirmative consent before allowing companies to track them chose* not *to share their data.***[17]

86.     Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiffs' and Class members' web browsers and (2) disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties, all without adequate notification to the individual and certainly without any consent, were invasions of Plaintiffs' and Class members' privacy.

87.     Plaintiffs and Class members have suffered injuries in the form of (i) invasion of

---

[15]  Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

[16]  Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf

[17]  *See* https://www.wired.co.uk/article/apple-ios14-facebook (**"According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US."**).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

privacy; (ii) statutory damages; (iii) the continued and ongoing risk to their personally identifying information that, once out, never can be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam and targeted advertisements enabled by The Hill website.

## CLASS ACTION ALLEGATIONS

88. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "The Hill Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the filing of the Complaint in this matter and through and including June 26, 2024, accessed and viewed the The Hill website and whose IP addresses and/or browser data and/or device data were collected by and disclosed to the third-party trackers embedded in the The Hill website.

89. Excluded from the The Hill Website Class are website users who registered to receive Defendant's The Hill newsletter. Employees of Defendant and employees of Defendant's parents, subsidiaries and corporate affiliates also are excluded from the Class. Plaintiffs reserve the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently discovered information.

90. This action properly may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

**Numerosity**

91. The The Hill Website Class that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine the identities of individual Class members.

92. Based on information and belief, the The Hill Website Class consists of at least 75 individuals. The Class is so numerous that joinder of all members is impracticable.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1

**Typicality**

2        93.     Plaintiffs' claims are typical of the claims of all of the other members of the The

3 Hill Website Class as Plaintiffs have suffered from the same violations of the law as other putative

4 Class members.  Plaintiffs' claims and the Class members' claims are based on the same legal

5 theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiffs and

6 all of the other Class members.

7 **Adequacy**

8        94.     Plaintiffs will fairly and adequately represent and protect the interests of the other

9 members of the Class.  Plaintiffs have retained competent counsel with substantial experience in

10 prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed to

11 prosecuting this action vigorously on behalf of the The Hill Website Class members and have the

12 financial resources to do so.  Neither Plaintiffs nor their counsel have any interests that are adverse

13 to the interests of other members of the The Hill Website Class.

14 **Commonality and Predominance**

15        95.     By its unlawful actions, Defendant has violated Plaintiffs' and the Class members'

16 rights under the CDAFA, CIPA the California Constitution, and the UCL.  The questions raised

17 are, therefore, of common or general interest to the Class members, who have a well-defined

18 community of interest in the questions of law and fact presented in this Complaint.

19        96.     This action involves common questions of law and fact that predominate over any

20 questions affecting only individual Class members.  Those common questions of law and fact

21 include, without limitation, the following:

22        (a)     Whether Plaintiffs and Class members had a reasonable expectation of privacy

23              when they accessed and visited Defendant's The Hill website during the proposed

24              class period;

25        (b)     Whether Defendant knowingly and without permission accessed Plaintiffs' and

26              Class members' computers during the proposed class period;

27         (c)     Whether Defendant knowingly and without permission altered, damaged, deleted,

28              destroyed, or otherwise used any data from Plaintiffs' and Class members'

computers during the proposed class period;

(d)   Whether Defendant knowingly and without permission took, copied or made use of any data from Plaintiffs' and Class members' computers during the proposed class period;

(e)   Whether Defendant knowingly and without permission added, altered, damaged, deleted or destroyed any data on or from Plaintiffs' and Class members' computers during the proposed class period;

(f)   Whether Defendant knowingly introduced any computer contaminant into Plaintiffs' and Class members' computers, computer systems, or computer networks during the proposed class period;

(g)   Whether Plaintiffs and Class members had a reasonable expectation of privacy in their personally identifying information, including IP addresses, when they accessed and visited Defendant's The Hill website during the proposed class period;

(h)   Whether each of the third-party trackers embedded in Defendant's The Hill website was a "pen register" under California Penal Code § 638.50(b);

(i)   Whether, during the proposed class period, Defendant had a policy or practice of collecting and sharing personally identifying and addressing information collected on Defendant's The Hill website including, without limitation, IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(j)   Whether, during the proposed class period, Defendant had a policy or practice of not disclosing to The Hill website users that it would collect and share their personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(k)   Whether, during the proposed class period, Defendant had a policy or practice of not obtaining The Hill website users' prior consent to collect and share personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

(l)    Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(m)   Whether Defendant's conduct invaded Plaintiffs' and Class members' privacy;

(n)    Whether Defendant's acts and practices violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(o)    Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(p)    Whether Defendant's acts and practices violated the California Constitution or individual rights arising under the California Constitution;

(q)    Whether Defendant's acts and practices resulted in unjust enrichment to Defendant;

(r)    Whether Defendant's acts and practices violated California Business & Professions Code §§ 17200, *et seq.*; and

(s)    Whether Plaintiffs and Class members are entitled to actual, statutory, nominal and/or other forms of damages, restitution, and other relief.

**Superiority**

97.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to the The Hill Website Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of the The Hill Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable

1    to enforce individual claims of this size on their own, and by Defendant's competitors, who will

2    be placed at a competitive disadvantage as their punishment for obeying the law.  Plaintiffs

3    anticipate no difficulty in the management of this case as a class action.

4          98.    The prosecution of separate actions by individual members of the The Hill Website

5    Class would create a risk of adjudications with respect to them that, as a practical matter, would

6    be dispositive of the interests of other members of the Class who are not parties to those

7    adjudications or that would substantially impair or impede the ability of those non-party members

8    of the Class to protect their interests.

9          99.    The prosecution of individual actions by members of the The Hill Website Class

10    also would run the risk of establishing inconsistent standards of conduct for Defendant.

11

12                              **FIRST CAUSE OF ACTION**
                    **Violation of the California Computer Data Access and Fraud Act**
                              **(California Penal Code § 502)**
13                          **(On Behalf of Plaintiffs and the Class)**

14          100.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and

15    further allege as follows.

16          101.    The California Legislature enacted the CDAFA with the intent to "expand the

17    degree of protection afforded to individuals, businesses, and governmental agencies from

18    tampering, interference, damage, and unauthorized access to lawfully created computer data and

19    computer systems."  Cal. Penal Code § 502(a).

20          102.    The Legislature further declared that "protection of the integrity of all types and

21    forms of lawfully created computers, computer systems, and computer data is vital to the

22    protection of the privacy of individuals as well as to the well-being of financial institutions,

23    business concerns, governmental agencies, and others within this state that lawfully utilize those

24    computers, computer systems, and data."  Cal. Penal Code § 502(a).

25          103.    To effectuate that purpose, the CDAFA affords a private right of action to owners

26    of computers, systems, networks, programs, and/or data who suffer damages or loss as a result of

27    a violation of the Act.  Cal. Penal Code § 502(e)(1).  There is no quantitative threshold of damage

28    to bring a claim, and there is no monetary threshold to qualify for CDAFA protection.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

104.    For purposes of the statute, several definitions were provided.  The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network."  Cal. Penal Code § 502(b)(1).

105.    The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions."  Cal. Penal Code § 502(b)(3).

106.    The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control."  Cal. Penal Code § 502(b)(5).

107.    The web browsers that Plaintiffs' and Class members' used to access Defendant's The Hill website are "computer software."  The computers on which Plaintiffs and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

108.    The statute also defines the term "data" broadly to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions."  The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."  Cal. Penal Code § 502(b)(8).

109.    The term "computer contaminant" refers to "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

110.   As discussed above, a website cookie (including a third-party tracker cookie) and an IP address both are "data" within the meaning of the statute.

111.   The website cookies installed by the Media.net tracker, CasaleMedia tracker, and Adnx tracker also constitute a "contaminant" under the CDAFA because they are designed to, and do, self-propagate to contaminate The Hill users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted.

112.   The third-party tracker cookies and tracking technology used by Defendant usurp the normal operation of Plaintiffs' and Class members' computing devices because they supplant Plaintiffs' and Class members' choices in how those devices and their resources, including energy resources, are used.   For example, the trackers command The Hill website users' computing devices to act in ways that are contrary to what was intended by Plaintiffs and Class members, such as storing unauthorized tracking cookies on their web browsers' and disclosing  to unknown third parties their identifying and addressing information without users' knowledge or consent.

113.   As described above in more detail in Paragraph 81, third-party tracker cookies are not necessary for any of Plaintiffs' or Class members' devices to communicate effectively with Defendant or it's the Hill website.

114.   Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

115.   The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network.  Cal. Penal Code § 502(c)(2).

116.   The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer

network.  Cal. Penal Code § 502(c)(4).

117.    Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system or computer network.  Cal. Penal Code §§ 502(c)(6) and (7).

118.    Under California Penal Code § 502(c)(8), it also is unlawful to knowingly introduce any computer contaminant into any computer, computer system, or computer network.  Cal. Penal Code § 502(c)(8).

119.    Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiffs' and Class members' web browsers during the proposed class period, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiffs' and Class members' data, computers, computer systems, and computer networks in violation of Penal Code § 502(c)(1).

120.    Similarly, the installation of those third-party tracker cookies violated subsection (c)(4) because Defendant added and altered data and computer software on Plaintiffs' and Class members' computers or computer systems.  Cal. Penal Code § 502(c)(4).

121.    By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiffs' and Class members' computers, computer systems and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).  Defendant's actions caused the data processing functions and networks of users' devices to redirect Plaintiffs' and Class members' data to the third-party trackers.

122.    Further, Defendant's unauthorized collection and disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties during the proposed class period violated Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses and browser and device data, from Plaintiffs' and Class members' computers, computer systems, or computer networks.

123.    Defendant's installation of the third-party tracker cookies also violates subsection (c)(8) because Defendant knowingly introduced a computer contaminant into Plaintiffs' and Class

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

members' computers, computer systems, or computer networks.  Cal. Penal Code § 502(c)(8).

124.    Defendant lacked permission to use and access Plaintiffs' and Class members' data, computers, computer systems, and computer networks in the manners described above and lacked permission to introduce the third-party trackers into The Hill website users' web browsers, all as evidenced by the following:

(a) When entering and accessing Defendant's The Hill website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies;

(b) The third-party trackers are incorporated seamlessly and invisibly in the background on Defendant's The Hill website, thereby giving Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling those third-party trackers to collect their personally identifying information and IP addresses; and

(c) Defendant does not seek permission from The Hill website visitors or otherwise ask them whether they consent to having their personally identifying and addressing information disclosed to and used by undisclosed third parties like Media.net, Index Exchange, and Xandr.

125.    Defendant's knowing conduct as described herein, including embedding and implementing third-party trackers on its The Hill website and installing third-party tracker cookies on The Hill website users' browsers without their knowledge or consent, violates the CDAFA.

126.    Plaintiffs and Class members are residents of California and were the owners or lessees of the computers, computer systems, computer networks, and data described herein. Plaintiffs and Class members used their computers, computer systems and/or computer networks in California.  Defendant accessed or caused to be accessed Plaintiffs' and Class members' data and other personally identifying information from within California.

127.    Case law has established that misappropriation of data that has financial value can state an economic injury under the CDAFA.  *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 939-940 (N.D. Cal. 2023), citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Cir. 2020). In *Brown*, the court recognized that browsing histories and similar data carry financial value and that an economic market for that data exists. *Id.*

128.    Defendant was unjustly enriched by accessing, acquiring, taking and using Plaintiffs' and Class members' data and computer systems during the proposed class period without their permission or consent and by using all of that identifying information, including their IP addresses and browsing data, to maximize revenue from selling advertising space on Defendant's The Hill website for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

129.    Further, website tracking technology, such as tracking beacons and the third-party tracking cookies used by Defendant, take up and use processing, storage, and power resources to run on users' devices.[18] Those website tracking cookies also cause webpages to load more slowly, thereby increasing the time and energy needed for devices to run. Overall, that additional processing, storage, and power usage results in increased energy and device costs for users. That extra cost is economic harm.

130.    As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiffs and Class members have suffered economic loss and damages. The statute imposes no minimum threshold for damages. Under Penal Code § 502(e)(1), Plaintiffs and Class members therefore are entitled to compensatory damages, injunctive relief and other equitable relief in an amount to be determined at trial.

131.    Plaintiffs and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

## SECOND CAUSE OF ACTION
### Unlawful Use of a Pen Register or Trap and Trace Device
### (California Penal Code §§ 638.51)
### (On Behalf of Plaintiffs and the Class)

132.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

---

[18]  See Joshua M. Pearce, *Energy Conservation with Open Source Ad Blockers* (Mar. 30, 2020), https://www.mdpi.com/2227-7080/8/2/18 (last accessed on January 2, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

133.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

134.    Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding that software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in *Matera v. Google Inc.* that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

135.    Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

136.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

137.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

138.    In essence, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.  For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is *incoming* information that is being sent to that same user.

139.    The three trackers embedded in Defendant's The Hill website – Media.net, CasaleMedia, and Adnx – are "pen registers" because each of them is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiffs' and Class members' computers, computer systems, and computer networks as they are accessing and visiting Defendant's The Hill website.

140.    At all relevant times during the proposed class period, Defendant installed each of the three pen register trackers on Plaintiffs' and Class members' web browsers and used the trackers to collect Plaintiffs' and Class members' IP addresses and/or browser and device data.  IP addresses constitute addressing information.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

141.    Unaware of Defendant's installation and use of the third-party trackers as pen registers during the proposed class period, Plaintiffs and Class members could not have provided and did not provide their prior consent to Defendant's installation or use of the third-party trackers or pen registers.

142.    Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' location data and other identifying information.

143.    Defendant's conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiffs and the The Hill Website Class. Under California Penal Code § 637.2, Plaintiffs and Class Members are entitled to and seek

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1    statutory damages of $5,000 for each of Defendant's numerous CIPA violations.

2                    **THIRD CAUSE OF ACTION**
                    **Invasion of Privacy**
3        **(Violation of Art. 1, § 1, California Constitution)**
           **(On Behalf of Plaintiffs and the Class)**

4        144.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and

5    further allege as follows.

6        145.    "Privacy" is listed in Article I, Section 1, of the California Constitution as one of

7    six fundamental rights of all Californians.  That section of the Constitution provides as follows:

8    "All people are by nature free and independent and have inalienable rights.  Among these are

9    enjoying and defending life and liberty, acquiring, possessing, and protecting property, and

10   pursuing and obtaining safety, happiness, and privacy."  Cal. Const. Art. I, § 1.

11       146.    The right to privacy in California's Constitution creates a right of action against

12   private entities such as Defendant.  To state a claim for invasion of privacy under the California

13   Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable

14   expectation of privacy; and (3) an intrusion so serious in nature, scope and actual or potential

15   impact as to constitute an egregious breach of social norms.

16       147.    Plaintiffs and Class members had a legally protected privacy interest in their

17   personally identifying information and addressing information that was captured during the

18   proposed class period, without notice or consent, when they accessed and viewed Defendant's The

19   Hill website.  Those privacy interests are recognized by the California Constitution, CDAFA,

20   CIPA, HIPAA, and numerous other statutes.

21       148.    Plaintiffs and Class members had a reasonable expectation of privacy under the

22   circumstances, as they could not reasonably have expected that Defendant would violate state and

23   federal privacy laws.  During the proposed class period, Plaintiffs and Class members were not

24   aware and could not reasonably have expected that Defendant would use website tracking

25   technology and install third-party tracker cookies without notice and without obtaining consent.

26   Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiffs' and

27   Class members' personally identifying and addressing information, including their IP addresses,

28   which contain geolocation data.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

149.    Defendant's unauthorized (1) installation of third-party tracker cookies and (2) disclosure to and sharing with unknown third parties of Plaintiffs' and Class members' personally identifying and addressing information during the proposed class period, all without consent or adequate notification to Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy.

150.    Defendant's conduct during the proposed class period constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in Defendant's The Hill website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiffs and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right.  Defendant's conduct constitutes a severe and egregious breach of social norms.

151.    As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

152.    Plaintiffs and The Hill Website Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned or received by Defendant as a result of or in connection with the intrusions upon Plaintiffs' and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiffs and Class members properly for the harm to their privacy interests.

153.    Plaintiffs also seek such other relief as the Court may deem just and proper.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

154.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and

further allege as follows.

155.    Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

156.    Plaintiffs and Class members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiffs and Class members without authorization and proper compensation.  Defendant has collected, disclosed, and otherwise misused that information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties that received Plaintiffs' and Class  members personal information and data.

157.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

158.    The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members.  It would be inequitable under unjust enrichment principles in California for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

159.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**Violations of California's Unfair Competition Law
(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)
(On Behalf of Plaintiffs and the Class)**

160.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

161.    California Business & Professions Code §§ 17200, *et seq*. ("UCL") prohibit unfair competition in the form of any unlawful, unfair, deceptive or fraudulent business act or practice.

162.    Defendant's business acts and practices are "unlawful" under the UCL because, as alleged above, Defendant violated the California Constitution, California common law, and other

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

California statutes and causes of action described in this complaint.

163.    Defendant's business acts and practices are "unfair" under the UCL.  California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated that public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data without Plaintiffs' and Class members' consent. Defendant's conduct violates the policies underlying the statutes referenced in this Complaint.

164.    Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm caused by Defendant secretly collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data is significant.  Further, there is no corresponding benefit resulting from that conduct.  Finally, because Plaintiffs and Class members were completely unaware of Defendant's conduct, they could not have avoided the harm that Defendant inflicted on them.

165.    Defendant's violations were and are willful, deceptive, unfair, and unconscionable.

166.    Had Plaintiffs and Class members known that their information would be collected and otherwise misused for Defendant's own benefit, they would not have used Defendant's website.

167.    Plaintiffs and Class members have a property interest in their sensitive personal data. By surreptitiously disclosing and otherwise misusing Plaintiffs' and Class members' information, Defendant has taken property from Plaintiffs and Class members without providing just compensation or, indeed, any compensation.

168.    California Business & Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of unfair, deceptive and fraudulent business acts and practices and may order restitution by Defendant to Plaintiffs for the practices alleged in this complaint.  Plaintiffs and Class members are entitled under California Business & Professions Code §§ 17203 and 17208 to restitution and restoration of all ill-gotten money and property belonging to Plaintiffs and the Class.

169.    Plaintiffs also seek injunctive relief in the form of a permanent injunction enjoining Defendant's unlawful and unfair business activities and practices, including an injunction terminating all downstream distributions of Plaintiffs' and the Class members' illegally collected personal data.  Plaintiffs additionally seek any and all other equitable relief that the Court deems proper.

170.    Plaintiffs' success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiffs sue on behalf of the proposed class as well as on behalf of themselves and the general public.

171.    Plaintiffs take upon themselves the enforcement of these laws and lawful claims. There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees from the recovery in this action. Therefore, an award of attorneys' fees is appropriate under California Code of Civil Procedure § 1021.5.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the Class, seek for the following relief:

a.    An order certifying the The Hill Website Class, appointing Plaintiffs Brian Carolus, Saber Khamooshi Ryan Wu, and John Deddeh as representatives of the The Hill Website Class, and appointing counsel for Plaintiffs as counsel for the The Hill Website Class;

b.    An order enjoining Defendant from engaging in the acts and practices complained of in this complaint;

c.    An order declaring that Defendant's actions, as described above, violated California Penal Code § 502;

d.    An order declaring that Defendant's actions, as described above, violated California Penal Code § 638.51;

e.    An order declaring that Defendant's actions, as described above, violated Art. 1, § 1 of the California Constitution;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

f.   An order declaring that Defendant's actions, as described above, violated California Business & Professions Code §§ 17200, *et seq*;

g.   A judgment for and award of compensatory damages and/or other equitable relief under California Penal Code § 502(e)(1) to Plaintiffs and each of the members of the The Hill Website Class;

h.   For each violation of CIPA, a judgment for and award of statutory damages of $5,000 under California Penal Code § 637.2 to Plaintiffs and each of the members of The Hill Website Class;

i.   A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiffs and all of the members of the The Hill Website Class are entitled by law;

j.   Disgorgement of profits and restitution and restoration of all costs incurred, sums or property unlawfully withheld, and/or losses caused by the acts and practices that violated California Business & Professions Code §§ 17200, *et seq.*;

k.   Payment of costs of the suit;

l.   Payment of attorneys' fees under California Code of Civil Procedure § 1021.5 and California Penal Code § 502(e)(2);

m.   An award of pre-judgment and post-judgment interest to the extent allowed by law; and

n.   Such other and/or further relief as the Court may deem proper.

Respectfully submitted,

Dated:  January 30, 2025          **KELLER GROVER LLP**

By:_____
ERIC A. GROVER
*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

1

2

**COHELAN KHOURY & SINGER**

By:  \_s/ *Isam C. Khoury*_____
         Isam C. Khoury, Esq.
         Attorneys for Plaintiff John Deddeh

3

4

5

**KEEGAN & BAKER, LLP**

6

By:  /s/ *Patrick N. Keegan*_____
         Patrick N. Keegan, Esq.
         Attorneys for Plaintiff John Deddeh

7

8

9

**JURY DEMAND**

10

Plaintiffs request a trial by jury of all claims that can be so tried.

11

12

Respectfully submitted,

13

Dated:  January 30, 2025          **KELLER GROVER LLP**

14

By:_____
         ERIC A. GROVER
         *Attorneys for Plaintiffs*
         Brian Carolus, Saber Khamooshi, and Ryan Wu

15

16

17

18

**COHELAN KHOURY & SINGER**

19

20

By:  s/ *Isam C. Khoury*_____
         Isam C. Khoury, Esq.
         Attorneys for Plaintiff John Deddeh

21

22

23

**KEEGAN & BAKER, LLP**

24

By: /s/ *Patrick N. Keegan*_____
         Patrick N. Keegan, Esq.
         Attorneys for Plaintiff John Deddeh

25

26

27

28

**KELLER GROVER LLP**
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

## CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION

Pursuant to L.R.5-1, the filer of this document, Eric Grover, hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.

Dated: January 30, 2025                    **KELLER GROVER LLP**

By: _____
        ERIC A. GROVER
        Attorneys for Plaintiffs
        Brian Carolus, Saber Khamooshi, and Ryan Wu

**KELLER GROVER LLP**
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861